501 So.2d 962 (1987)
STATE of Louisiana, Appellee,
v.
Ira Joe MIMS, Appellant.
No. 18303-KA.
Court of Appeal of Louisiana, Second Circuit.
January 21, 1987.
Rehearing Denied February 19, 1987.
*963 Richard E. Hiller, Indigent Defender Office, Shreveport, for appellant.
William J. Guste, Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., Howard M. Fish and Tommy J. Johnson, Asst. Dist. Attys., Shreveport, for appellee.
Before MARVIN, NORRIS and LINDSAY, JJ.
MARVIN, Judge.
After being found guilty by jury verdict, Ira Joe Mims appeals his convictions and his sentences for the crimes of second degree battery and purse snatching. LRS 14:34.1, 65.1. He received hard labor and concurrent sentences of five years, the maximum without enhancement, for the battery, and of 35 years with enhancement for the purse snatching, having been found to be a multiple offender under LRS 15:529.1.
Mims argues four assignments of error, most of which relate to the trial court's rulings regarding eyewitness identification, its admissibility and, according to some studies, its fallibility. We affirm the convictions and the sentences.

FACTS
In the early evening hours of January 12, 1985, the 70-year-old victim was approached by the assailant, whom she did not know, when she returned home from grocery shopping. Asked if her husband was home, she replied that she expected him in a minute. The assailant then played with the victim's dog in her front yard.
*964 As was her custom, the victim honked the horn of her car for a neighbor to help her with the groceries. A teenage neighbor responded and saw the man carry one sack of groceries from the victim's car to the front steps. After the neighbor returned inside her home for a coat, the assailant first started to walk away but turned to approach the victim, striking her about her left eye, knocking her against her car, and then taking her purse which was under her left arm. The neighbor again appeared and found the victim on the ground asking for help. The victim was hospitalized for 18 days, initially in intensive care, for her serious head, back and eye injuries.
Two days later, when defendant was arrested on an unrelated charge, the victim's credit card was found in the car defendant was driving. Five days after the battery, the victim gave a statement to the police and picked defendant's picture from a photographic lineup which was displayed to the victim at the hospital. Defendant was then arrested for the subject crimes.

MOTION TO SUPPRESS IDENTIFICATION
Defendant sought to suppress the victim's identification of him in the photographic lineup, alleging the lineup was suggestive. We have reviewed that lineup.
The six photographs in the lineup are all of black males of similar appearance. The police officer who compiled and presented the lineup testified that after he told the victim the lineup may or may not contain the photograph of the man who took her purse, the victim picked a photograph of defendant without any suggestion from him as to which photograph to pick. The victim testified that no one suggested which photograph she should pick and that she did not have doubt in her mind about which one was the photograph of the man who attacked her.
Although the victim did not give the police a description of her assailant before she viewed the lineup, the trial court found her identification of defendant's photograph to have been "very positive." The court did not find anything impermissible or suggestive in the lineup, and denied the motion to suppress identification.
On appeal, defendant argues that the lineup was impermissibly suggestive because the police officer allegedly "told" the victim to pick photograph No. 5 rather than No. 1. The transcript of the victim's statement given to the police officer was introduced at trial. This transcript shows that the victim inquired whether the number under the picture of Mims was a 5 or a 6. The police officer told the victim that the number under the picture she had picked was a 5. On cross-examination the victim testified she had trouble distinguishing the numbers because of her eye injury, but she did not have trouble recognizing the man's face and she did not change her mind about which photograph depicted her assailant. The numbers under the photographs are handwritten and are indeed quite small.
The police officer repeatedly testified that he did not suggest, by words or gestures, which photograph the victim should pick, and that he did not indicate to the victim that she had made the "right choice" after she identified defendant's photograph.
A defendant attempting to suppress an identification must first show that the identification procedure was suggestive, and secondly, that there was a likelihood of misidentification by the eyewitness. Even if the identification procedure was suggestive, the identification will be admissible, if under the totality of the circumstances, it is found to be reliable. State v. Guillot, 353 So.2d 1005 (La.1977); State v. Evans, 485 So.2d 161 (La.App. 2d Cir.1986), writ denied.
Here, the photographs displayed to the victim were of persons with a sufficient resemblance of characteristics and features to reasonably test the identification. The photographs have no distinguishing marks and they were not displayed in such a way that the victim's attention would be unduly focused on the defendant. The format of *965 the lineup was not suggestive. See State v. Guillot, supra; State v. Clark, 437 So.2d 879 (La.App. 2d Cir.1983), writ denied.
At the hearing on the motion to suppress, the police officer and the victim testified that no suggestions were made about which photograph the victim should choose. This testimony was reiterated at trial. Although the victim admitted some difficulty in discerning whether the number under the photograph she picked was a 5 or a 6, she did not demonstrate any confusion about which photograph depicted her assailant.
Even if we were to assume that the identification procedure was suggestive, the identification will not be suppressed unless a likelihood of misidentification is shown. The factors considered in assessing the reliability of the identification include the opportunity of the witness to view the criminal at the time of the crime; the degree of attention paid by the witness to the criminal; the accuracy of the witness's prior description of the criminal; the level of certainty demonstrated at the confrontation; and the time between the crime and the confrontation. State v. Evans, supra.
Here, the victim had the opportunity to view her assailant when she noticed him in her yard and conversed with him before the crime occurred. Her attention was focused upon him when she responded to his questions about her husband and when, unsolicited, he carried a bag of her groceries. She showed no hesitancy in identifying defendant's photograph in the lineup five days after the crime. Weighing the strength of these factors against the absence of a physical description by the victim before she viewed the lineup, we find no error in the trial court's denial of defendant's motion to suppress the identification.

EXPERT TESTIMONY
Defendant sought to introduce opinion evidence by Dr. Robert L. Benefield, an experimental psychologist, concerning factors which increase and decrease the probability of accurate post-incident identifications by eyewitnesses. The state objected, citing State v. Stucke, 419 So.2d 939 (La.1982), which we shall discuss with other cases. After allowing the prospective witness to be examined as to his expert qualifications outside the presence of the jury, the court sustained the State's objection.
Dr. Benefield, a professor of psychology at LSUS, received a master's degree in 1967 and a Ph.D. in 1973 in experimental psychology. Experimental psychologists conduct research but do not treat patients in a clinical setting. While teaching at Louisiana Tech between November 1967 and August 1970, Dr. Benefield conducted research designed to assess the ability of individuals to answer questions about stressful events they had perceived. This research showed that as the degree of stress increased, the observers' accuracy in reporting factual details decreased.
The research Dr. Benefield had been conducting when defendant was tried in December 1985 focused on the effect of stress on the memory and recall capabilities of college students and cadets at a local police academy.
Dr. Benefield testified he was familiar with the research in eyewitness identification and could give the jury an up-to-date and general review of the literature about human perception and memory. He admitted that he had not testified in or out of court concerning the fallibility of specific eyewitness identifications, nor had he had any discussion with the victim in this case.
The trial court's ruling, denying admissibility, was based partially on jurisprudence stating that the prejudicial effect of this type of testimony outweighed its probative value, and partially on the court's statement that it was not impressed with this witness's qualifications to express an opinion about this victim or any victim in similar circumstances.
A witness who seeks to testify as an expert must establish to the satisfaction *966 of the trial court that he has special knowledge of the subject about which he is called upon the express an opinion. LRS 15:466. The competence of an expert witness is a question of fact to be determined within the sound discretion of the trial court. Rulings on the qualification or competence of witnesses to give expert testimony will not be disturbed unless they are manifestly erroneous. State v. Drew, 360 So.2d 500 (La. 1978).
The admissibility of expert testimony concerning the reliability or unreliability of eyewitness identification was discussed in State v. Stucke, supra. The court found the trial court had not abused its discretion in ruling that opinion testimony was inadmissible. The court concluded that the opinion evidence would invade the province of the jury and that it may have a greater influence on the jury than the other evidence presented during trial. While the majority opinion suggested that such evidence may never be admissible, the concurring opinion of Justice Lemmon suggested that the question of admissibility should be addressed on a case-by-case basis to determine whether the expert opinion evidence might assist the jury in deciding whether a defendant's identity in the particular case had been proved beyond a reasonable doubt. 419 So.2d at 951.
In State v. Chapman, 436 So.2d 451 (La.1983), the trial court allowed expert testimony concerning studies which generally reflected the fallibility of eyewitness identification in some circumstances. The issue of admissibility was not squarely before the court on defendant's appeal of his conviction. In a footnote, the court cited Stucke and discussed the concurring opinion's suggestion that such evidence may be admissible in some cases.
In State v. Coleman, 486 So.2d 995 (La. App. 2d Cir.1986), writ denied, this court found no abuse of the trial court's discretion in refusing to admit expert testimony on the fallibility of human perception and memory. The refusal in Coleman was based partially on the trial court's doubt that eyewitness identification is a proper subject for expertise and partially on the particular witness's lack of qualifications.
Similarly, Dr. Benefield's current research dealt with improving the study skills of students. His past research, while more closely related to eyewitness identification by victims of crimes, was conducted some 15 years before this trial. When we consider this record and the circumstances of this victim's identification of the defendant we cannot find that the trial court abused its discretion in its ruling.
The victim's identification of defendant in the lineup was reliable and was corroborated by the teenage neighbor's independent identification of defendant as the perpetrator and by the presence of the victim's credit card in defendant's car two days after her purse was stolen. In this particular case there was adequate evidence offered from which the jury could determine the facts based on common knowledge, education and experience. We cannot conclude that opinion evidence about the fallibility of human perception and memory in general was necessary for the jury to resolve the identity issue. See State v. Williams, 431 So.2d 885 (La.App. 2d Cir.1983), writ denied. While it is not necessary, in these circumstances, for us to consider whether the trial court abused its great discretion in ruling on the competence of the expert to testify (compare State v. Trosclair, 443 So.2d 1098 (La. 1983)), we find no abuse of discretion in the trial court's ruling that the opinion evidence in this case was inadmissible.

JURY CHARGE
Defendant requested a special jury charge listing factors to be considered in determining whether an eyewitness identification of the defendant should be taken as proof beyond a reasonable doubt that defendant was the perpetrator of the crime. The trial court declined to give this charge, noting that it was included in the charges as to other issues and that it would be a comment on the evidence.
*967 The charge given to the jury included the explanation of "reasonable doubt" required by CCrP Art. 804 and defined each element of the two offenses for which defendant was being tried. The charge also informed the jury that it must find defendant was the perpetrator of each offense in order to convict him of that offense. The jury was specifically instructed to consider the ability and the opportunity of witnesses to observe and remember the matters about which they testified.
A requested special jury charge need not be given if it is included in the general charge. CCrP Art. 807. In its charge to the jury, a trial court may not comment on the evidence or give an opinion as to what has or has not been proved. CCrP Art. 806.
Here, the general tenor of the requested charge was adequately covered in the general charge. Defendant's identity as the perpetrator of the offenses was an essential part of the State's burden of proof but was not the only element of the offenses which the jury had to consider in reaching the verdicts. The trial court should not give a charge from which the jury might infer that the court has a doubt about a defendant's identification. The fallibility of eyewitness identifications was argued at length in defense counsel's closing argument. See and compare State v. Foy, 439 So.2d 433 (La.1983); State v. Richey, 258 La. 1094, 249 So.2d 143 (1971); State v. Richardson, 459 So.2d 31 (La.App. 1st Cir. 1984).
We find no error in the trial court's refusal to give the requested jury charge.

EXCESSIVENESS OF SENTENCE
Defendant argues that the sentences he received were constitutionally excessive and that the trial court improperly relied on a recommendation made by the probation officer who prepared the pre-sentence investigation report in this case.
The recommendation, which was read into the record by the trial judge, was the concluding paragraph of the PSI report:
It is our opinion that Mims is a career offender. He continues to deny any knowledge of the offenses for which he has been found guilty, even though the evidence clearly showed that he was guilty. Mims obviously has no remorse for his actions. It is evident that, for the protection of the public, Mims should be incarcerated for as long as the law allows. We are recommending that the maximum penalties allowed by law be imposed in this case.
Although the trial court quoted the recommendation, the court expressly observed that it was not bound by the recommendation. Defendant received the maximum sentence of five years for the second degree battery offense. The maximum sentence he could have received for the enhanced purse snatching offense was 40 years. The court imposed a sentence of 35 years to run concurrently with the five-year sentence on the other charge. The court articulated the factual basis for imposing the particular sentences on the individual before the court, as required by CCrP. Art. 894.1. See and compare State v. Jackson, 360 So.2d 842 (La.1978).
Even though a sentence falls within the statutory limits for the offense, it may be constitutionally excessive if it is grossly disproportionate to the severity of the offense or if it is nothing more than the purposeless and needless imposition of pain and suffering. State v. Beavers, 382 So.2d 943 (La.1980); State v. Cunningham, 431 So.2d 854 (La.App. 2d Cir.1983), writ denied.
We cannot say that a 35-year sentence imposed on a third felony offender, with a history of crimes against persons, is grossly disproportionate to the severity of the offense, which caused serious bodily injury to the victim. We cannot say that the sentence is nothing more than the purposeless and needless imposition of pain and suffering. The trial court correctly found that the defendant's history reflected an undue risk that he would commit other crimes and that he was in need of *968 correctional treatment which could best be provided by incarceration.
After reviewing the evidence presented at the trial on the merits and at the hearing to determine multiple offender status, as well as the information contained in the pre-sentence investigation report, we find no constitutional infirmity in the sentences.

DECREE
Defendant's convictions and sentences are AFFIRMED.