714 So.2d 854 (1998)
STATE of Louisiana, Appellee,
v.
Michael Wayne PICKNEY, Defendant-Appellant.
No. CR97-1591.
Court of Appeal of Louisiana, Third Circuit.
May 27, 1998.
*855 Earl Taylor, Dist. Atty., for State.
Paula C. Marx, Lafayette, for Michael Wayne Pickney.
Before THIBODEAUX, SAUNDERS and DECUIR, JJ.
SAUNDERS, Judge.
On January 27, 1995, the Defendant, Michael W. Pickney, was charged by grand jury indictment with aggravated rape, a violation of La.R.S. 14:42(A). The Defendant appeared for arraignment and entered a plea of not guilty. Jury selection was held on February 3, 1997. The Defendant was tried by a jury on February 24 and 25, 1997, and was found guilty as charged by an unanimous verdict. On September 19, 1997, the trial court sentenced the Defendant to serve life in prison without benefit of parole, probation, or suspension of sentence. The Defendant now appeals asserting two assignments of error.

FACTS
Between the hours of 3:00 and 4:00 a.m. on June 12, 1994, Christine Scott, the victim, returned home to her apartment after attending a zydeco dance. Before entering her apartment, she picked up her eighteen-month-old daughter from her neighbor who was babysitting. Shortly thereafter, Ms. Scott and her child went to sleep in her bed. Before falling asleep, Ms. Scott heard a series of knocks on her front door. Ms. Scott went to the window but did not see anyone and, therefore, returned to bed. Later, she awoke and saw a male intruder standing in the doorway of her bedroom. She could not see his face as he was wearing a stocking over his head. The intruder then jumped back into the hall according to the victim. When he reappeared, he was wearing a ski mask over his face. At some point, the intruder took the mask off; however, the victim never saw his face.
The victim's child awoke and began to cry, and the intruder allegedly told Ms. Scott to quiet the child or he would kill the child. After she quieted the child, Ms. Scott asked to go to the bathroom. The man allowed her to go but followed her. After they returned to the bedroom, the intruder raped Ms. Scott. During the incident, the intruder was armed with a knife which he stroked across the victim's back. After raping the victim, the intruder left the apartment, and Ms. Scott went for help. The entire incident lasted approximately twenty minutes, and the rape itself lasted five minutes. Thereafter, Ms. Scott went to the hospital where a rape kit was performed.
Two witnesses, Lloyd W. Henry and Keith Henry (cousins), testified that they saw the Defendant, Michael Wayne Pickney, who they both knew, at the victim's apartment complex between the hours of 1:00 a.m. and 2:00 a.m. on the morning that the victim was raped. The Henrys testified that the Defendant was wearing a white T-shirt and dark jeans and exhibited a lot of facial hair that evening; Lloyd Henry also stated that the Defendant was wearing boots. The victim also testified that the rapist was wearing a white T-shirt, dark jeans, and boots; however, such information was not contained in the written statement she gave to the police.
Based on the information received from the Henrys, the police picked up the Defendant and took him to the police station for questioning. The Defendant's home was searched, and Detective Tommy Hidalgo testified that he confiscated a pair of dark brown jeans and high top shoes from the Defendant's home and then turned the evidence over to Detective Roland Rivette. However, such a seizure of clothing was not mentioned in Detective Hidalgo's investigation report. Moreover, Detective Rivette testified that he did not recall receiving such evidence from Detective Hidalgo, and further if such evidence had actually been seized, it had been lost since that time. At trial, the State did not introduce the clothing allegedly seized from the Defendant's home.
After leaving the hospital, the victim was also taken to the police station. The victim told the investigating police officers that she was unable to describe the face of her attacker and could not estimate his height or weight but she could identify his voice. Thereafter, a voice line-up was conducted. The line-up was conducted at approximately *856 11:00 a.m., only a few hours after the time of the rape. On cross-examination at trial, the victim testified that approximately one year prior to the rape she had suffered permanent and apparently total hearing loss in her left ear as the result of a bullet wound to the head. Detective Rivette testified that he was not aware of the victim's 50% hearing loss at the time he conducted the voice line-up.
A total of three men, including the Defendant, participated in the voice line-up. The victim was placed in an interrogation room, and the three men were placed in an outer hallway where the victim could not see them. The men were asked to repeat certain phrases through the doorway that the assailant had spoken during the rape. The Defendant was the second man in the voice line-up. When the Defendant repeated the phrases, the victim identified the Defendant's voice as the voice of her assailant. Trial testimony was unclear as to whether the third person chosen for the line-up actually participated after the victim identified the Defendant.
At trial, the victim admitted that she had sex with a third person while using a condom approximately twenty-four hours before the rape. The State introduced evidence concerning the results of DNA testing which had been conducted using the victim's blood, the Defendant's blood, and samples of the sperm and other materials which had been collected after the rape. Expert testimony concerning the results of the testing indicated that the Defendant could not be excluded as the sperm donor.

ERRORS PATENT
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.[1]

ASSIGNMENT OF ERROR NO. 1
By this assignment, the Defendant asserts the voice identification line-up conducted during the investigation of this case was suggestive and led to a substantial likelihood of misidentification, and based on these grounds, his conviction should be reversed.
During the attack, the victim did not see the face of her attacker, as he wore a stocking and later a ski mask over his face, nor could she estimate his height or weight. However, she indicated to the investigating police officers that she could identify her assailant by his voice. Within hours of the rape, the victim was taken to the police station for a voice line-up. On cross-examination, the victim testified that approximately one year prior to the rape she had suffered permanent and apparently total hearing loss in her left ear as the result of a bullet wound to the head. Detective Roland Rivette testified that he was not aware of the victim's 50% hearing loss at the time he conducted the voice line-up.
A total of three men, including the Defendant, participated in the voice line-up. At approximately 11:00 a.m. on the same morning of the rape, the victim was placed in an interrogation room, and the three men were placed in an outer hallway. Defense counsel was not present during the line-up; according *857 to testimony, the Defendant signed a waiver of rights form prior to the line-up. The first man was asked to repeat certain phrases through the doorway that the assailant had spoken during the rape; a negative response was received from the victim after the first participant spoke. The Defendant was the second man in the voice line-up. When the Defendant repeated the phrases, the victim cringed and became visibly upset according to the officers. Without hesitation, she identified the Defendant's voice as the voice of her assailant. Trial testimony was unclear as to whether the third person chosen for the line-up actually participated after the victim identified the Defendant. At no time during the line-up was the victim allowed to view the three men.
The jurisprudence involving general line-up procedure has held that due process is violated only when both the identification procedures were suggestive, and a substantial likelihood of misidentification existed. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Duncan, 93-1384 (La.App. 3 Cir. 4/6/94); 635 So.2d 653, writ denied, 94-1067 (La.10/28/94); 644 So.2d 649. Very little Louisiana law exists on the topic of voice identification procedures, and much less exists concerning line-ups based exclusively on voice identification. References to such procedures have appeared in opinions in which appellate courts have either impliedly or expressly accepted their use. See State v. Lacoste, 256 La. 697, 237 So.2d 871 (1970); State v. Worthen, 550 So.2d 399 (La.App. 3 Cir.1989); State v. Harris, 540 So.2d 1226 (La.App. 3 Cir.), writ denied, 550 So.2d 626 (La.1989); State v. Colvin, 494 So.2d 1357 (La.App. 2 Cir.), writ denied, 497 So.2d 311 (La.1986)
Considering the facts of this case, the first inquiry is whether the identification procedures were suggestive. Three individuals were used in the line-up. The two men other than the Defendant were described by the testifying police officers as two black males who worked in the kitchen of the police station. Although a total of three men, including the Defendant, were chosen to participate, some trial testimony suggests that only the Defendant himself and the man who preceded the Defendant actually participated, as apparently the victim identified the Defendant (the second man to speak) immediately, and thus, the third man was not asked to participate. However, other testimony seems to indicate that all three men participated.
The Defendant argues that an audiotape of the line-up should have been prepared so that the similarity or dissimilarity of the voices could have been reviewed on appeal. Yet, the Defendant failed to raise this issue at trial. Furthermore, trial testimony does not indicate that the voices were so dissimilar as to render the procedure suggestive.
During his testimony, Detective Rivette admitted that the instant case was the first time he had conducted a voice line-up and that the line-up was not flawless. He stated that for his next voice line-up, he would require seven participants. Nevertheless, it is our opinion that the small number of line-up participants involved in this case did not cause the line-up to be suggestive.
In determining the proper parameters in which to conduct a non-suggestive voice line-up, we believe it is important to distinguish between voice and traditional line-ups. Obviously, not all of the participants in a voice line-up can be evaluated at the same time; thus, the victim must listen to participant's statements individually. In doing so, it is impermissible for the authorities to unnecessarily focus attention upon the Defendant. One method of focusing such attention upon the Defendant would involve manipulating the characteristics of the participants voices so that only the Defendant's voice would fit the description given by the victim.[2] Here, the record contains no evidence of dissimilarity between the participants' voices.
Another possible means of unduly focusing attention upon a defendant in an identification procedure would involve using a *858 very low number of participants. However, determining whether an identification procedure is suggestive depends upon the facts and circumstances of each case. State v. Newman, 283 So.2d 756 (La.1973), cert. denied, 415 U.S. 930, 94 S.Ct. 1442, 39 L.Ed.2d 489 (1974), and under certain circumstances, a small number of participants, even only one, will not be found to be unduly suggestive.[3]
The evidence before us establishes that the victim heard at least two, and possibly all three, of the participants in the voice line-up, and she unequivocally identified the second participant as her assailant. Nothing in the record suggests any factor that would have implied to the victim that the second voice, rather than the first or third, was that of the perpetrator of the crime. Under these circumstances, we cannot conclude that this line-up was suggestive, regardless of whether the third participant was actually heard. In sum, this assignment of error lacks merit.
In finding that the identification procedure used was not unduly suggestive, our inquiry ends, and we need not proceed to the second prong set forth in Brathwaite, i.e., whether there existed a substantial likelihood of misidentification. See Colvin, 494 So.2d 1357, and State v. Evans, 485 So.2d 161 (La.App. 2 Cir.), writ denied, 488 So.2d 687 (La.1986).

ASSIGNMENT OF ERROR NO. 2
The Defendant next argues that his constitutional right to confront and cross-examine witnesses against him was violated when the State failed to present as evidence certain pieces of physical evidence seized from his home. The evidence to which he refers included articles of clothing allegedly seized from the Defendant's home by Detective Tommy Hidalgo. Hidalgo testified that he seized a pair of dark brown jeans and high top shoes from the Defendant's home (clothing similar to those worn by the Defendant, according to the victim and eyewitnesses on the night of the rape). Detective Hidalgo testified that he relinquished the seized clothing to Detective Roland Rivette, although such a seizure was not noted in Hidalgo's investigation report. Detective Rivette testified that he did not recall receiving such evidence from Hidalgo, and further that, if the clothing was indeed seized, it was now missing from the evidence room of the sheriff's department.
Although the Defendant frames his argument in terms of a confrontation issue, all of the witnesses whose testimony was related to the issue of the description of clothing and/or the seizure of the clothing from his home were called to testify and were subject to cross-examination by the Defendant. The victim and two other eyewitnesses testified as to the clothing they observed being worn on the night of the rape. Detectives Hidalgo and Rivette testified concerning the disputed seizure of clothing from the Defendant's home. The Defendant cites no authority in support of the assertion that the State was required, under these circumstances, to present such physical evidence at trial, and we know of no such authority.
With respect to the contradictory testimony given by State witnesses, Detectives Hidalgo and Rivette, resolution of such an issue involves a determination of the credibility of witnesses. In State v. Hongo, 625 So.2d 610 (La.App. 3 Cir.1993), writ denied, 93-2774 (La.1/13/94); 631 So.2d 1163, this court stated the following:
The trier of fact may accept or reject, in whole or in part, the testimony of any witness. State v. Williams, 452 So.2d 234 (La.App. 1 Cir.1984), writ not considered, 456 So.2d 161 (La.), reconsideration not considered, 458 So.2d 471. The fact that the record contains evidence which conflicts *859 with the testimony accepted by the trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Tompkins, 403 So.2d 644 (La. 1981), appeal after remand, 429 So.2d 1385 (La.1982). Thus, in the absence of internal contradictions or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient to support the requisite factual conclusion. State v. Owens, 606 So.2d 876 (La.App. 2 Cir.1992).
Id. at 616.[4]
See also State v. Boswell, 96-801 (La.App. 3 Cir. 2/12/97); 689 So.2d 627; State v. Henry, 95-428 (La.App. 3 Cir. 10/4/95); 663 So.2d 309, writ denied, 96-0681 (La.5/16/97); 693 So.2d 793. Thus, the jury was free to accept either witness' testimony concerning whether such clothing was in fact seized from the Defendant's home and relinquished to Detective Rivette. This assignment lacks merit.

CONCLUSION
For the foregoing reasons, the Defendant's conviction is affirmed.
AFFIRMED.
NOTES
[1] We note that aggravated rape is a crime of violence defined by La.R.S. 14:2(13)(i). In the 1997 legislative session, the legislature amended article 890.1, requiring the court, when imposing sentence, to designate whether the crime involved is a crime of violence or an attempted crime of violence as defined or enumerated in La.R.S. 14:2(13). Since Article 890.1 does not provide a sanction for failure to comply with this requirement, we find that the failure to comply was harmless and should not be recognized as an error patent.

Additionally, the record indicates the trial court did not give the Defendant credit toward service of his sentence for time he spent in actual custody prior to the imposition of the sentence. We note, however, that La.Code Crim.P. art. 880 was amended by Act No. 788 of the 1997 Regular Session, deleting the requirement that the trial court must give a defendant credit for time served when imposing sentence. The Defendant was sentenced on September 19, 1997, after the effective date of the amendment, August 15, 1997. The new article 880 provides: "A defendant shall receive credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence." The comment to the article states, "This article makes the credit for prior custody self-operating even on a silent record. It does not change the law." Thus, we find it is no longer necessary to recognize the failure to give credit for time served as an error patent.
[2] For example, if two of the participants would have been shown to have a high pitched, or squeaky voice, while the Defendant (who was described by the victim as having a deep voice) is the only close possible match, the line-up clearly would have been suggestive.
[3] We note that one-on-one confrontations between a suspect and witness, although not favored by law, are permissible when justified by the overall circumstances. See State v. Caine, 94-0119 (La.App. 1 Cir. 3/3/95); 652 So.2d 611, writ denied, 95-0860 (La.10/27/95); 661 So.2d 1358, wherein such an identification procedure was found not to be unduly suggestive even though this identification took place at the police station approximately six hours after the incident. In evaluating the circumstances of the case, the court found that the identification was permissible since the complainant immediately identified the defendant as the perpetrator, and the defendant matched the complainant's description of clothing, physical features, size, and race of the assailant.
[4] We note that Hongo, 625 So.2d 610, has a lengthy subsequent case history which is irrelevant to this particular issue.